**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Vantage Mobility International LLC, | No. CV-19-04684-PHX-JJT |
| Plaintiff, | **ORDER** |
| v. | |
| Kersey Mobility LLC, *et al.*, | |
| Defendants. | |

At issue are Plaintiff Vantage Mobility International LLC's ("VMI") Application for Preliminary Injunction (Doc. 5, PI Mot.), to which Defendant Kersey Mobility, LLC ("Kersey") filed a Response[1] (Doc. 21, PI Resp.) and VMI filed a Reply (Doc. 32, PI Reply); and Kersey's Motion to Dismiss First Amended Complaint for Failure to State a Claim under Rules 12(b)(6) and 9(b) (Doc. 48, MTD), to which VMI filed a Response (Doc. 56, MTD Resp.) and Kersey filed a Reply (Doc. 71, MTD Reply). The Court heard oral argument on the Preliminary Injunction request on October 16, 2019, and the Motion to Dismiss on October 17, 2019. (Docs. 73, 74, 95, 100.) Although VMI filed the First Amended Complaint ("FAC") after the Preliminary Injunction Application, the Court will

---

[1] In a separate Order, the Court dismissed VMI's claims against the other responding Defendant, the Braun Corporation, for lack of personal jurisdiction. (Doc. 102.) After it filed the present Application for Preliminary Injunction, VMI amended the Complaint to add Defendants Kersey Mobility Systems, Inc., Jensen8, Inc., Michael Kersey, and Michael Jensen. (Doc. 38-1.) Because only one now-remaining Defendant was named at the time VMI filed the Application for Preliminary Injunction, only one Response is on file.

resolve the Application by considering the FAC as the operative pleading and addressing the Motion to Dismiss for Failure to State a Claim in conjunction with the Application.

## I.  BACKGROUND

Plaintiff VMI is an Arizona company that produces and sells wheelchair-occupied, lowered-floor minivan conversions. Since 2011, Defendant Kersey has been an authorized dealer of VMI products in certain portions of the State of Washington. Kersey is made up of two members, Defendants Kersey Mobility Systems, Inc. and Jensen8, Inc. VMI alleges that Defendant Michael Kersey is the "sole governor" of Kersey Mobility Systems, Inc. and Defendant Michael Jensen is a "governor" of Jensen8.

In 2017, VMI and Kersey entered into an Authorized Dealer Agreement for Kersey to sell VMI's manual equipment (Doc. 54-8, Auth. Dealer Agree.), and a Select Dealer Agreement for Kersey to sell VMI's powered equipment (Doc. 54-9, Select Dealer Agree.). Each Agreement includes separate Dealer Policies, and the Agreement and Policies together constitute "Dealer Relationship Documents (DRD)." A Territory and Location Policy attached to the Authorized Dealer Agreement provides that if Kersey wishes "to sell or cease operating one or more of [Kersey's] locations at or from which any or all of [VMI's] Products are sold," VMI has a right of notice, first offer, and first refusal. (Doc. 54-8 at 7, Location Policy.)

In November 2018, VMI added an Assignment and Change of Control Policy to the DRD as "governed by either the Select Dealer Agreement or the Authorized Dealer Agreement." (Doc. 54-10, Control Policy.) That Policy states that, without the prior written consent of VMI, Kersey may neither "assign any or all of its rights or delegate the performance of any or all of its duties and obligations" under the agreements with VMI nor transfer control of Kersey. The Policy purports to survive any termination of the associated Agreements. The parties dispute whether the Control Policy is enforceable against Kersey.

The Braun Corporation ("BraunAbility") is an Indiana company that also produces and sells wheelchair-occupied, lowered-floor minivan conversions and thus is a competitor of VMI. VMI alleges that BraunAbility orchestrated the purchase of all of Kersey's

1 membership interests by one of BraunAbility's subsidiaries, Defendant Arch Channel Investments LLC ("Arch"), in June 2019, and that VMI stands to lose market share in Washington to BraunAbility, since Kersey is now owned by one of BraunAbility's subsidiaries. VMI claims that, by entering into the membership interest sale, Kersey breached its agreements with VMI (Count 1) and that Defendants' conduct constituted tortious interference with contractual relations (Count 2), unfair competition under A.R.S. § 44-1402 (Count 3), civil conspiracy (Count 4), and consumer fraud under A.R.S. § 44-1522 (Count 5). (Doc. 37, First Am. Compl. ("FAC").)

VMI now asks the Court to enter a preliminary injunction against Kersey to unwind the transfer of its membership interests to Arch and compel Kersey to perform under the terms of the agreements with VMI. For its part, Kersey moves to dismiss the claims against it for failure to state a claim under Federal Rules of Civil Procedure 12(b)(6) and 9(b).

## II. LEGAL STANDARDS

### A. Preliminary Injunction

To obtain a preliminary injunction, a plaintiff must show that "(1) [it] is likely to succeed on the merits, (2) [it] is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in [its] favor, and (4) an injunction is in the public interest." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The Ninth Circuit Court of Appeals, employing a sliding scale analysis, has also stated that "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1078 (9th Cir. 2013) *cert. denied*, 134 S. Ct. 2877 (2014) (quoting *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1132 (9th Cir. 2011)).

### B. Dismissal for Failure to State a Claim

When analyzing a complaint for failure to state a claim for relief under Federal Rule of Civil Procedure 12(b)(6), the well-pled factual allegations are taken as true and

construed in the light most favorable to the nonmoving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). Legal conclusions couched as factual allegations are not entitled to the assumption of truth, *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009), and therefore are insufficient to defeat a motion to dismiss for failure to state a claim. *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010).

A dismissal under Rule 12(b)(6) for failure to state a claim can be based on either (1) the lack of a cognizable legal theory or (2) insufficient facts to support a cognizable legal claim. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). "While a complaint attacked by a Rule 12(b)(6) motion does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations omitted). The complaint must thus contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that 'recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

Where a plaintiff alleges fraud or misrepresentation, Rule 9(b) imposes heightened pleading requirements. While malice, intent, knowledge, and other conditions of mind may be alleged generally, the circumstances constituting fraud must be pled with particularity. Fed. R. Civ. P. 9(b). Specifically, "[a]verments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)). Furthermore,

> a plaintiff must set forth more than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false. In other words, the plaintiff must set forth an explanation as to why the statement or omission complained of was false or misleading.

*In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994).

## III. ANALYSIS

With regard to VMI's request for a Preliminary Injunction, the Court's analysis begins and ends with the first element of the *Winter* test, namely, VMI's likelihood of success on the merits of its claims. VMI grounds its request for injunctive relief in all five of its claims against Defendants, so the Court will examine VMI's likelihood of success on the merits of each claim in turn. In light of Kersey's Motion to Dismiss, the Court will concurrently determine if VMI has adequately stated claims against Kersey in the FAC under the Federal Rules of Civil Procedure.

### A. Breach of Contract

Under Arizona law,[2] a breach of contract claim requires a plaintiff to show (1) a contract, (2) a breach, and (3) damages. *Thunderbird Metallurgical, Inc. v. Ariz. Testing Lab.*, 423 P.2d 124, 126 (Ariz. 1967). The interpretation of a contract is a question of law for the court to decide, and the court must give effect to a contract provision as written if it is clear and unambiguous. *Hadley v. Sw. Props., Inc.*, 570 P.2d 190, 193 (Ariz. 1977).

#### 1. Location Policy

In Count 1 of the FAC, VMI alleges Kersey breached the DRD in two ways. First, VMI alleges Kersey violated the Location Policy by failing to give VMI notice of Arch's offer to acquire Kersey's membership interests as well as rights of first offer and first refusal. (FAC ¶ 64.) The Location Policy obligates Kersey to take certain actions only if it "wishes to sell or cease operating one of more of [its] locations at or from which any or all of the Authorized Products are sold." (Location Policy ¶ 3.) The Court agrees with Kersey that the Location Policy "is only triggered when Kersey wishes to sell one or more of its 'locations,'" not upon a sale of its membership interests. (MTD at 6 (quoting Location Policy ¶ 3).) The very title of the Policy at issue, "Territory and Location," is indicative of its purpose. Moreover, if VMI's proposed interpretation were correct that selling membership interests is equivalent to selling a location, then the Control Policy—which

---
[2] The DRD specify that Arizona law controls. (Auth. Dealer Agree. ¶ 8; Select Dealer Agree. ¶ 9.)

- 5 -

explicitly addresses instances of a transfer of control of Kersey's membership interests—would be redundant to the Location Policy and the necessity of VMI's actions to add the Control Policy to the DRD would be unclear. VMI's interpretation of the Location Policy would also purport to bind non-parties to the Agreements—the owners of Kersey desiring to transfer their membership interests in Kersey—which cannot be.

When Kersey's owners transferred their membership interests to Arch, Kersey did not "sell or cease operating one or more of [its] locations" (Location Policy ¶ 3). On its face, Kersey's membership interest sale had no effect on the location of sales of VMI products. As a result, VMI cannot state a claim for breach of contract against Kersey under the Location Policy for the sale of its membership interests to Arch.

### 2. Control Policy

Second, VMI alleges Kersey violated the Control Policy by failing to obtain VMI's prior written consent before selling its membership interests to Arch. (FAC ¶ 65.) While the Control Policy was not in place when VMI and Kersey executed the Authorized Dealer and Select Dealer Agreements in 2017,[3] VMI alleges that, on November 16, 2018, it added the Control Policy to the DRD. (FAC ¶ 31.) VMI also alleges that, at a meeting on November 14, 2018, at the Stuck Junction Saloon in Sumner, Washington, VMI member Jeff Weston discussed "among other things, the Control Policy" with Michael Kersey and Mr. Kersey did not object to it. (FAC ¶ 38.) VMI further alleges that it sent an email to Mr. Kersey on November 21, 2018, to provide him with a copy of the Control Policy, and he opened the email and thereafter never objected to the Control Policy. (FAC ¶¶ 32, 33, 39.)

The parties dispute whether the terms of the Agreements allow VMI to add the Control Policy to the DRD without Kersey's agreement in writing and whether the Control

---

[3] In its Motion to Dismiss, Kersey points out that, on the first page of the Authorized Dealer Agreement, it appears that VMI Inc., not Plaintiff VMI LLC, entered into the Agreement, so Plaintiff VMI LLC lacks standing to enforce the Agreement. Although VMI failed to address that argument in its Response, its counsel explained at oral argument that listing "VMI Inc." as the contracting party in the Authorized Dealer Agreement was a scrivener's error and that the balance of the Policies in the DRD refer to "VMI LLC." (Doc. 95 at 11.) For the sake of resolving the present Application and Motion, the Court will assume without deciding that VMI LLC has standing to enforce the Authorized Dealer Agreement.

- 6 -

Policy required assent and consideration to be enforceable. The Court agrees with Kersey that the Select Dealer Agreement explicitly does not allow such an addition. That Agreement states, "No modification or waiver of any provisions(s) of the DRD will be deemed effective unless in writing and signed by each Party." (Select Dealer Agree. ¶ 15.) The FAC contains no allegations that Kersey signed the Control Policy, so it was never incorporated into the Select Dealer Agreement. Thus, VMI cannot state a claim for breach of contract against Kersey under the Select Dealer Agreement.[4]

The Authorized Dealer Agreement states, "At any time and without prior notice . . . VMI may modify any or all of the Dealer Policies . . . with each such modification . . . becoming effective immediately, unless VMI notifies Dealer in writing of another effective date." (Auth. Dealer Agree. ¶ 7.) That Agreement also provides, "The DRD, as modified from time to time . . . may be amended or modified only by a written supplement and, in the case of this Agreement only, duly executed by both of the Parties, as each Party hereby waives its right, if any, to modify the DRD orally." (Auth. Dealer Agree. ¶ 12.) VMI argues that these provisions allow for amendment or modification of the DRD if such amendment or modification is in writing, even without the signature of the parties to the Agreement. Thus, VMI contends, the terms of the Authorized Dealer Agreement allowed VMI to add the Control Policy without Kersey's signature. (MTD Resp. at 3.)

Kersey argues that the Control Policy is not an enforceable agreement because (1) even if Kersey continued to perform under the Agreement after VMI attempted to add the Control Policy, there was no mutual assent to the Control Policy as required in the common law of contracts and under the Uniform Commercial Code (UCC); (2) there was no consideration for the Control Policy; (3) even without consideration, the "unilaterally-imposed, infinitely-enforceable" Control Policy does not meet "reasonable commercial

---

[4] Kersey argues that, because the Control Policy is equally applicable to both the Select Dealer Agreement and the Authorized Dealer Agreement, VMI's failure to properly incorporate the Control Policy in the Select Dealer Agreement is necessarily fatal to its incorporation in the Authorized Dealer Agreement. (MTD Reply at 3-4.) Because the Control Policy states that it can apply to "either" Agreement, the Court disagrees.

- 7 -

standards of fair dealing" under the UCC; and (4) even assuming Kersey had knowledge of the Control Policy, it is substantively unconscionable. (MTD Reply at 4-5.)

Although VMI refers to its addition of the Control Policy to the DRD as a "modification," it is actually a proposed new agreement on a term—the alienability of Kersey's membership interests—that no other part of the Agreement or Policies contemplated. It is a "modification" in the sense that it modifies the relationship between VMI and Kersey, but not in the sense that it modifies an existing contractual term.

Considering the Control Policy to be a proposed new agreement, the Court must examine if it was a validly formed contract. Under Arizona law, a "contract is 'a bargain in which there is a manifestation of mutual assent to the exchange and consideration.'" *Johnson v. Earnhardt's Gilbert Dodge, Inc.*, 132 P.3d 825, 828 (Ariz. 2006) (quoting Restatement (Second) of Contracts ("Restatement") § 17(1) (1981)).

### a. Mutual Assent

"A contract cannot be unilaterally modified nor can one party to a contract alter its terms without the assent of the other party." *Yeazell v. Copins*, 402 P.2d 541, 545 (Ariz. 1965). This is true even if the original contract purports to allow one party to modify the contract by methods other than issuing a new contract, such as publishing a supplemental policy; in that instance, the provision in the original contract allowing modification by supplement is "no more than an offer to modify the existing contract," for which there still must be assent and consideration to become enforceable. *Demasse v. ITT Corp.*, 984 P.2d 1138, 1141, 1144 (Ariz. 1999). And this is true even in the context of Article 2 of the Uniform Commercial Code (UCC), governing the sale of goods, which Arizona has adopted. Although UCC § 2-209, which Arizona codified at A.R.S. § 47-2209, allows modification of a contract for the sale of goods without consideration, "section 2-209 requires assent to proposed modifications." *Arizona Retail Sys., Inc. v. Software Link, Inc.*, 831 F. Supp. 759, 764 (D. Ariz. 1993).

"Mutual assent is ascertained from objective evidence, not [from] the hidden intent of the parties. Objective evidence includes written and spoken words as well as acts."

*Johnson*, 132 P.3d at 828 (internal quotations omitted). That is, "what is operative is the objective manifestations of assent by the parties." *Hill-Shafer P'ship v. Chilson Family Tr.*, 799 P.2d 810, 815 (Ariz. 1990). Intentional conduct of an offeree creating the appearance of assent may be evidence of assent, so long as the offeree "knows or has reason to know that his conduct may cause the other party to understand that he assents." Restatement § 19 cmt. c; *see also Johnson*, 132 P.3d at 828 (citing Restatement § 19(1)). But "[a]cceptance by silence is exceptional. Ordinarily an offeror does not have power to cause the silence of the offeree to operate as acceptance. . . . The mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak." Restatement § 69 cmt. a. Whether conduct constitutes assent is generally a question of fact. *Empire Mach. Co. v. Litton Bus. Tel. Sys.*, 566 P.2d 1044, 1049-50 (Ariz. Ct. App. 1977).

In the FAC, to support its claim that Kersey assented to the terms of the Control Policy, VMI alleges that "[m]embers of VMI, including Jeff Weston, met with Mr. Kersey on November 14, 2018, at the Stuck Junction Saloon in Sumner, Washington to discuss, among other things, the Control Policy" and that "[a]t no point during the meeting did Mr. Kersey object to the Control Policy." (FAC ¶ 38.) VMI also alleges that "[o]n November 21, 2018, VMI sent Mr. Kersey an email notifying him of the supplement and provided him a copy of the Control Policy," and that "[u]pon information and belief, Mr. Kersey opened the email." (FAC ¶¶ 32, 33.) With respect to Kersey's Rule 12(b)(6) Motion, these allegations are sufficient—if just barely—for the Court to plausibly infer that Mr. Kersey assented to the Control Policy.

The evidence presented in conjunction with VMI's Preliminary Injunction request provided some detail to VMI's allegations in the FAC. During cross examination at the Preliminary Injunction hearing, Mr. Weston testified that he presented the concept of the Control Policy—but not a copy of the Control Policy itself—to Mr. Kersey at the Stuck Junction Saloon meeting in conjunction with a proposed new dealer agreement that VMI was rolling out, which new dealer agreement Mr. Kersey did not accept. (Doc. 100 at 54-55.) Mr. Weston also stated that he did not pitch the Control Policy in the context of the

parties' already-existing Authorized Dealer Agreement. (Doc. 100 at 55.) As for sending the email to Mr. Kersey a week later with the Control Policy attached, the evidence shows that the email was titled simply "Assignment and Change of Control Policy_to Dealers" (Docs. 54-16, 54-17), and Mr. Weston testified that the text of the email did not describe what the attached Policy was or what Agreement it purported to modify (Doc. 100 at 52-53).

The fact that Kersey may have continued to act as an authorized dealer of VMI products after VMI sent the Control Policy to Mr. Kersey is not convincing evidence of assent, because the daily business of sales did not implicate the terms of the Control Policy. The Court cannot conclude that the evidence evinces knowledge on the part of Mr. Kersey that his silence or lack of response to VMI's attempted offer of the Control Policy would constitute assent to that Policy. Thus, from the evidence before it, the Court does not find that VMI has demonstrated a likelihood of success on the merits in showing that Mr. Kersey assented to supplementing the Authorized Dealer Agreement with the Control Policy.

### b. Unconscionability and Reasonable Standards of Fair Dealing

Kersey also argues against enforcement of the Control Policy because its terms are unconscionable. (MTD at 8-10.) In support, Kersey cites *Seekings v. Jimmy GMC of Tucson, Inc.*, which states that a contract term is unconscionable when "in light of the general commercial background and the commercial needs of the particular case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract." 638 P.2d 210, 216 (Ariz. 1981). Arizona recognizes two types of unconscionability: procedural, which arises in the bargaining process at the time of contract formation, and substantive, where the contract terms are *per se* unconscionable. *Nickerson v. Green Valley Recreation, Inc.*, 265 P.3d 1108, 1117 (Ariz. Ct. App. 2011). "The determination of whether a contract is unconscionable is to be made by the trial court as a matter of law." *Id.*

Kersey argues that the Control Policy is substantively unconscionable because its term allowing VMI to void any acquisition of Kersey's membership interests is onerous and perpetual, that is, Kersey cannot walk away from it because the Control Policy purports to survive termination of the Dealer Agreements. (MTD at 9.) The Court first notes that there are no allegations or evidence that the Control Policy itself was the result of bargaining or negotiating between the parties. But these are not unsophisticated parties. An agreement that VMI has the right to approve the sale of one of its authorized dealerships is not unconscionable on its face, because it is in VMI's interest to know who controls its authorized dealers. The onerous or one-sided provision in the Control Policy is that which states that the Policy survives termination of any underlying Agreement between Kersey and VMI. Under the plain terms of that provision, Kersey would still have to seek approval to sell its membership interests, even if it were not a dealer of VMI products at all.

VMI cites *Pacesetter Motors, Inc. v. Nissan Motor Corporation in USA* in support of its argument that a contract term requiring a manufacturer's approval for the sale of one of its dealerships is commercially reasonable and appropriate. 913 F. Supp. 174 (W.D.N.Y. 1996). To the extent that case—in which the Western District of New York interpreted California law—could be persuasive here, it addressed a franchise agreement, which creates a different relationship than a simple sales agreement. Moreover, the Court's concern lies with the Control Policy's term providing that it survives termination of the underlying Agreements, such that Kersey cannot escape the Control Policy by terminating the Agreements. VMI has not cited any legal authority demonstrating that such a term is commercially appropriate.

Viewed through the lens of UCC Article 2, the relevant portion of the Arizona statutes incorporating UCC § 2-209, A.R.S. § 47-2209, provides that an "agreement modifying a contract within this chapter needs no consideration to be binding." But any modifying agreement must still meet the UCC's good faith test, where the parties must observe "reasonable commercial standards of fair dealing in the trade." A.R.S. § 47-2209 cmt. 2. The Court's assessment of the Control Policy under the UCC would mirror that for

unconscionability. A perpetual term requiring a manufacturer's approval for the sale of membership interests in a seller does not meet reasonable commercial standards of fair dealing in the trade. Under either assessment, the Court holds invalid the Control Policy term that it will survive termination of the underlying Agreements.

The Authorized Dealer Agreement provides that, if "one or more parts of the DRD shall be held invalid, the remainder of the DRD shall continue in full force and effect, and each such part shall be deemed not to be a part of the DRD." (Auth. Dealer Agree. ¶ 11.) Because the invalid term can be severed from the balance of the Control Policy, the remainder of the Control Policy is valid to the extent VMI and Kersey reached a meeting of the minds as to its formation.

### B. Tortious Interference with Contractual Relations

Kersey does not move to dismiss Count 2, for tortious interference with contractual relations, because VMI does not raise that claim against Kersey in the FAC. The Court's analysis is thus limited to whether VMI has demonstrated a likelihood of success on the merits of this claim in conjunction with its Preliminary Injunction request.

Under Arizona law, "[a] prima facie case of intentional interference with contract requires alleging the following:

(1) the existence of a valid contractual relationship;
(2) knowledge of the relationship on the part of the interferor;
(3) intentional interference inducing or causing a breach;
(4) resultant damage to the party whose relationship has been disrupted; and
(5) that the defendant acted improperly."

*ABCDW LLC v. Banning*, 388 P.3d 821, 831 (Ariz. Ct. App. 2016) (internal citations omitted).

In the FAC, VMI alleges that Kersey's two members— Kersey Mobility Systems, Inc. and Jensen8, Inc.—as well as those two entities' governors, Mr. Kersey and Mr. Jensen, intentionally interfered with the contract between Kersey—their own LLC—and VMI. (FAC ¶¶ 69-70.) Applying the Arizona Court of Appeals' reasoning in an analogous

case, based on the allegations in the FAC, the Court must infer that the Defendant entities and their governors "were all acting within the scope of their authority as management representatives" of Kersey, and because they "were acting *for* the company, they cannot be interfering with a contract *of* the company." *Payne v. Pennzoil Corp.*, 672 P.2d 1322, 1327 (Ariz. Ct. App. 1983). That is, the contract underlying a tortious interference with contract claim must be one between the plaintiff and a third party, not the plaintiff and the defendant. *Id.* Because VMI does not allege facts supporting the plausible inference that these Defendants acted independently of their authority as representatives of Kersey, VMI has neither stated a claim for tortious interference with contract against these Defendants nor demonstrated a likelihood of success on the merits of such a claim.

### C. Unfair Competition under A.R.S. § 44-1402

In Count 3, VMI brings a claim of unfair competition against Kersey, Kersey Mobility Systems, Inc., and Mr. Jensen under A.R.S. § 44-1402, but not under its federal analog, the Sherman Act. (FAC ¶¶ 75-80.) In its Motion to Dismiss, Kersey identifies a fundamental problem with this claim, which is dispositive here. The text of A.R.S. § 44-1402, in its entirety, is as follows: "A contract, combination or conspiracy between two of more persons in restraint of, or to monopolize, trade or commerce, any part of which is in this state, is unlawful."

Here, the facts alleged by VMI lead the Court to conclude that no part of anything identified in the statute—not a contract, combination, or conspiracy and not a restraint or monopolization of trade or commerce—occurred in Arizona. Specifically, the contract that VMI alleges gives rise to an unfair competition claim is between two Washington companies, Arch and Kersey, for the purchase of membership interests in Kersey, a company that sells wheelchair-occupied, lowered-floor minivan conversions in Washington. Even if the Court takes as true VMI's allegations that the purchase was orchestrated by Braun, it is an Indiana company. Likewise, according to the allegations in the FAC, any restraint or monopolization of trade or commerce takes place in Washington

through Braun's alleged dominance in that market after Arch's purchase of Kersey's membership interests.

VMI does not provide any legal support for the proposition that the Arizona unfair competition statute could apply to void a Washington contract related solely to sales in the Washington market simply because the company potentially affected by market changes resulting from the contract is an Arizona company. Indeed, the plain language of A.R.S. § 44-1402 provides otherwise. *See In re OSB Antitrust Litig.*, 2007 WL 2253425, at *15 (E.D. Pa. Aug. 3, 2007) (stating that A.R.S. § 44-1402 requires "that at least some part of the alleged injury have occurred within the state and have affected consumers within the state"). Accordingly, VMI has not stated a claim under A.R.S. § 44-1402 or demonstrated a likelihood of success on the merits of such a claim.

### D. Civil Conspiracy

As in Count 2, Kersey does not move to dismiss Count 4, for civil conspiracy, because VMI does not raise that claim against Kersey in the FAC. But Count 4 fails because Count 2 does. Under Arizona law, to be liable for civil conspiracy, the defendants must have accomplished an underlying tort. *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Tr. Fund*, 38 P.3d 12, 37 (Ariz. 2002). Because VMI fails to state a claim for tortious interference with contract against the Defendants named in Counts 2 and 4—Kersey Mobility Systems, Inc., Jensen8, Mr. Kersey, and Mr. Jensen—and VMI has not raised another tort claim against these Defendants, VMI has not stated a claim for civil conspiracy or demonstrated a likelihood of success on the merits of that claim.

### E. Consumer Fraud under A.R.S. § 44-1522

In Count 5, VMI claims all Defendants violated the Arizona Consumer Fraud Act, A.R.S. § 44-1522, by concealing from VMI the sale of Kersey's membership interests to Arch, a subsidiary of Braun, with the intent that VMI would "rely on the concealment of the acquisition in connection with the sale and advertising of wheelchair-occupied, lowered-floor minivan conversions through Kersey." (FAC ¶¶ 84-91.)

As a consumer protection statute, the ACFA is "a broad act intended to eliminate unlawful practices in merchant-consumer transactions." *Holeman v. Neils*, 803 F. Supp. 237, 242 (D. Ariz. 1992) (internal citation omitted). The ACFA prohibits any "deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby." A.R.S. § 44-1522. The Rule 9(b) requirement that fraud be pled with particularity applies to claims alleging fraudulent activity in violation of the ACFA. *See Williamson v. Allstate Ins. Co.*, 204 F.R.D. 641, 644 (D. Ariz. 2001); *Silvas v. GMAC Mortg., LLC*, No. CV-09-265-PHX-GMS, 2009 WL 4573234, at *6-7 (D. Ariz. Dec. 1, 2009).

The conduct VMI alleges in the FAC is not the type of conduct contemplated by the ACFA, because VMI is not a consumer and its agreement for Kersey to sell its products is not a merchant-consumer transaction. VMI does not allege that a consumer relied on Kersey's concealment of the sale of its membership interests to Arch and suffered damage or injury as a result. *See In re Ariz. Theranos, Inc. Litig.*, 256 F. Supp. 3d 1009, 1023 (D. Ariz. 2017) (noting ACFA claim requires that a consumer rely on a false statement, causing injury); *Holeman*, 803 F. Supp. at 242 (same); *Erchonia Med. Inc. v. Smith*, No. CIV-02-2036-PHX-MHM, 2005 WL 8160621, at *10 (D. Ariz. Dec. 21, 2005) (noting the plaintiff could not assert it relied on the alleged misrepresentation because the plaintiff was not a consumer who read the misrepresentation before purchasing or declining to purchase the defendant's product).

In its Response, VMI cites a single statement in *Cheatham v. ADT Corp.*, 161 F. Supp. 3d 815, 825 (D. Ariz. 2016), to support its argument that it can sue even though it was not a consumer who relied on a misrepresentation: "Arizona courts construe the ACFA to provide a right of action on any person damaged by a violation of the Act." By that statement, the *Cheatham* court conveyed that the Arizona Supreme Court has construed the ACFA as creating a private right of action—a principle set forth in the case the *Cheatham*

court cited, *Sellinger v. Freeway Mobile Home Sales, Inc.*, 521 P.2d 1119 (Ariz. 1974). The *Cheatham* court did not state that a non-consumer—indeed, in this instance, the manufacturer of the product for sale—could sue upon relying on a misrepresentation by the seller. Both the plaintiffs in *Sellinger* and *Cheatham* were consumers of products sold by the defendants, and VMI has not cited any case in which a court has extended the ACFA to non-consumers. The ACFA does not apply to protect VMI, as the manufacturer, in its contractual relationship with Kersey, as its seller, and VMI's ACFA claim thus fails.[5] Likewise, VMI cannot demonstrate a likelihood of success on the merits of such a claim.

## IV. CONCLUSIONS

For the reasons stated above, the Court will grant Kersey's Motion to Dismiss with respect to VMI's breach of contract claim (Count 1) for (1) breach of the Location Policy; (2) breach of the Control Policy as it pertains to the Select Dealer Agreement; and (3) any breach of the term that the Control Policy survives termination of the underlying Agreements. After voiding that term, the Court will deny Kersey's Motion to Dismiss with respect to VMI's claim for breach of the Control Policy as it pertains to the Authorized Dealer Agreement. However, upon considering the evidence before it, the Court finds VMI is not likely to succeed on the merits of that claim and is thus not entitled to preliminary injunctive relief as to its breach of contract claim.

The Court will also grant Kersey's Motion to Dismiss as to the other two claims against it, unfair competition under A.R.S. § 44-1402 (Count 3) and consumer fraud under A.R.S. § 44-1522 (Count 5). Because the rationale for dismissing these claims applies with equal force to the other Defendants, the Court will dismiss these claims against all Defendants. *Silverton v. Dep't of Treasury of U.S.A.*, 644 F.2d 1341, 1345 (9th Cir. 1981).

---

[5] As in VMI's claim under the Arizona unfair competition statute, the Court questions the application of the ACFA to what the Court can only infer from VMI's allegations to be a misrepresentation by Kersey, a Washington entity, in conjunction with a purchase by a Washington consumer of a product sold by Kersey in Washington. Because VMI is not a proper party to bring a claim under the ACFA here, the Court need not resolve whether the ACFA could apply to protect Washington consumers from misrepresentations by Washington sellers.

The Court also finds that VMI has not stated a claim for tortious interference with contractual relations (Count 2) and civil conspiracy (Count 4), and thus VMI has no likelihood of success on the merits of those claims.[6] Because VMI has failed to demonstrate a likelihood of success on the merits of any of its claims, the Court will deny VMI's Application for Preliminary Injunction.[7] *See Garcia*, 786 F.3d at 740 ("Because it is a threshold inquiry, when a plaintiff has failed to show the likelihood of success on the merits, we need not consider the remaining three [Winter elements]." (internal quotations omitted)).

**IT IS THEREFORE ORDERED** denying Plaintiff Vantage Mobility International LLC's Application for Preliminary Injunction (Doc. 5).

**IT IS FURTHER ORDERED** granting in part and denying in part Defendant Kersey Mobility, LLC's Motion to Dismiss First Amended Complaint for Failure to State a Claim under Rules 12(b)(6) and 9(b) (Doc. 48). The Court dismisses Plaintiff's unfair competition claim under A.R.S. § 44-1402 (Count 3) and consumer fraud claim under A.R.S. § 44-1522 (Count 5) as well as portions of Plaintiff's breach of contract claim (Count 1), as detailed in this Order.

Dated this 24th day of January, 2020.

Honorable John J. Tuchi
United States District Judge

---

[6] No motion to dismiss Counts 2 and 4 is before the Court, so those claims remain pending.

[7] The Court found the possibility of success on the merits of a portion of Count 1, for breach of contract, to be unlikely but plausible. To the extent the Ninth Circuit applies a sliding scale, the Court finds the balance of equities does not tip sharply in VMI's favor so as to overcome the lack of likelihood of success on the merits. *See Drakes Bay Oyster Co.*, 747 F.3d at 1078.