**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Vantage Mobility International LLC,

          Plaintiff,

v.

Kersey Mobility LLC, *et al.*,

          Defendants.

No. CV-19-04684-PHX-JJT

**ORDER**

At issue are: 1) Plaintiff's Amended Motion for Leave to Amend First Amended Complaint (Doc. 226, "Motion to Amend"), to which Defendant filed a Response (Doc. 246) and Plaintiff filed a Reply (Doc. 253); 2) Defendant's Motion for Summary Judgment (Doc. 281, "MSJ"), to which Plaintiff filed a Response (Doc. 296) and Defendant filed as a Reply (Doc. 303); 3) Plaintiff's Motion for Relief from Judgment Based on Newly Discovered Evidence (Doc. 264), to which Defendant filed a Response (Doc. 275) and Plaintiff filed a Reply (Doc. 277); 4) Defendant's Motion to Amend/Correct Answer to Amended Complaint (Doc. 258), to which Plaintiff filed a Response (Doc. 270) and Defendant filed a Reply (Doc. 274); 5) Defendant's Appeal of Magistrate Judge Decision to District Court (Doc. 229), to which Plaintiff filed a Response (Doc. 250) and Defendant filed a Reply (Doc. 255); and 6) Defendant's Motion for Sanctions (Doc. 233), to which Plaintiff filed a Response (Doc. 254) and Defendant filed a Reply (Doc. 261).

The Court recently resolved eight additional motions the parties had filed on related issues. (Docs. 316, 319, 321, 323, 325–6.) The instant Motions are more than amply

briefed, and the Court concludes further argument would not assist it in its resolution of the remaining issues. LRCiv. 7.2(f).

## I.      BACKGROUND AND PROCEDURAL POSTURE

Plaintiff Vantage Mobility International, LLC ("VMI") is an Arizona company that produces and sells wheelchair-occupied, lowered-floor minivan conversions. Since 2011, Defendant Kersey Mobility LLC ("Kersey") has been an authorized dealer of VMI products in certain portions of the State of Washington. Until the events that led to this action, Kersey was comprised of two members, Kersey Mobility Systems, Inc. ("Kersey Inc.") and Jensen8, Inc. ("Jensen8"). VMI alleges that Michael Kersey is the "sole governor" of Kersey Inc. and Michael Jensen is a "governor" of Jensen8.

In 2017, VMI and Kersey entered into an Authorized Dealer Agreement ("ADA"), under which Kersey would sell VMI's manual equipment, and a Select Dealer Agreement ("SDA"), under which Kersey would sell VMI's powered equipment. The ADA and SDA each included separate Dealer Policies, and the Agreements and Policies together constitute Dealer Relationship Documents ("DRD"). A Territory and Location Policy (the "Location Policy") attached to the ADA provided that if Kersey wished "to sell or cease operating one of more of [Kersey's] locations at or from which any or all of [VMI's] Products are sold," VMI would have a right of notice, first offer, and first refusal.

Neither the ADA nor the SDA was exclusive, so Kersey was free to sell other products made by VMI's competitors. On November 14, 2018, VMI and Kersey held in-person discussions about replacing the ADA and SDA with an Exclusive Agreement under which Kersey would become a dealer of only VMI products for ten years. The parties also contemplated that the Exclusive Agreement, if ultimately entered, would give VMI a right of first refusal to purchase Kersey, if Kersey wished to "sell its business" during that ten-year term. At the November 14 meeting, Mr. Jensen, on behalf of Kersey, signed a Term Sheet acknowledging the "contemplated contract" and noting the term sheet did not constitute a binding agreement or obligate any party, unless both parties ultimately

- 2 -

executed a "Definitive Agreement" thereafter. The parties further discussed the proposed Exclusive Dealer Agreement, but never executed a definitive agreement thereon.

A week later, on November 21, 2018, VMI drafted and sent to all its dealers via email an Assignment and Change of Control Policy to the DRD ("Control Policy") as "governed by either the Select Dealer Agreement or the Authorized Dealer Agreement." That Policy stated that, without the prior written consent of VMI, Kersey may neither "assign any or all of its rights or delegate the performance of any or all of its duties and obligations" under the agreements with VMI nor transfer control of Kersey. The Policy also purported to survive any termination of the associated Agreements.

The Braun Corporation ("BraunAbility") is an Indiana company that also produces and sells wheelchair-occupied, lowered-floor minivan conversions and thus is a competitor of VMI. Arch Chanel Investments, LLC ("Arch") is a subsidiary of BraunAbility. In June 2019, Arch purchased 100 percent of the membership interests in Kersey from Kersey Inc. and Jensen8. That same day, Arch filed an action against VMI in Washington State court, seeking declaratory judgment that neither the Control Policy nor the Location Policy were operative to bar the sale of Kersey to Arch. VMI filed the instant action several weeks later in this Court, naming as defendants Kersey, Kersey Inc., Michael Kersey, Jensen8, Michael Jensen, and BraunAbility, but not Arch.

VMI alleged in the operative First Amended Complaint (Doc. 37, "FAC") that BraunAbility orchestrated Arch's purchase of all of Kersey's membership interests by Arch and that VMI stood to lose market share in Washington to BraunAbility, since Kersey is now owned by one of BraunAbility's subsidiaries. VMI claimed that, by entering into the membership interest sale, Kersey breached its agreements with VMI (Count 1) and that Defendants' conduct constituted tortious interference with contractual relations (Count 2), unfair competition under A.R.S. § 44-1402 (Count 3), civil conspiracy (Count 4), and consumer fraud under A.R.S. § 44-1522 (Count 5). (FAC.)

VMI also moved for a Preliminary Injunction, seeking an Order requiring Kersey to halt its sale to Arch and to afford VMI right of first refusal in the sale transaction, and

prohibiting any of the parties from breaching or interfering with the Agreements or committing anticompetitive acts. (Doc. 5.) BraunAbility moved to dismiss for lack of personal jurisdiction (Doc. 20), and Kersey moved to stay or dismiss the action under the Colorado River abstention doctrine (Doc. 30), and separately to dismiss for failure to state a claim. (Doc. 48.)  After allowing briefing on all of the above motions and conducting a two-day hearing on same, the Court denied VMI's Preliminary Injunction (Doc. 103) and Kersey's Abstention Motion (Doc. 74). It granted BraunAbility's motion to dismiss, finding the District of Arizona lacked personal jurisdiction over BraunAbility. (Doc. 102.) Finally, The Court granted in part Kersey's 12(b)(6) Motion, dismissing VMI's Count 1 claims against Kersey for breach of the Location Policy in its entirety and for breach of the Control Policy as to the SDA,[1] as well as VMI's Arizona unfair competition claim in Count 3 and its Arizona consumer fraud claim in Count 5, as against all Defendants. (Doc. 103 at 16.) The Court dismissed each of those claims with prejudice. (Doc. 113 at 7.)

No party moved to dismiss the remaining claims in the FAC—Count 2, alleging tortious interference with contractual relations, and Count 4, alleging civil conspiracy based on Count 2—but because VMI based its Preliminary Injunction motion in part on these claims, the Court did of necessity evaluate them and concluded that VMI had failed to state claims for these counts. (Doc. 103 at 13, 14; Doc. 113 at 7.) In denying VMI's Motion for Reconsideration of its Orders denying preliminary injunctive relief and dismissing claims, the Court specifically found VMI would not be able to cure the defects in those claims via amendment, and thus clarified Counts 2 and 4 were dismissed with prejudice. (Doc. 113 at 7.) Thus, upon resolution of the above motions, the Court had dismissed portions of Count 1, as well as Counts 2 through 5 in their entirety, with prejudice, and had dismissed BraunAbility as a defendant for lack of personal jurisdiction, without prejudice. (Doc. 113 at 6.)

---

[1] In denying Kersey's 12(b)(6) Motion in part, the Court let stand VMI's contract clam in Count 1 for breach of the Control Policy as regards the ADA, but held invalid the Control Policy's term providing that it would survive termination of the ADA (Doc. 103 at 12), and severed that term.

VMI filed a Notice of Interlocutory Appeal, appealing, among other issues, the Court's Orders denying preliminary injunctive relief, dismissing BraunAbility for lack of personal jurisdiction, and denying VMI's motion for reconsideration of its Orders dismissing BraunAbility and Counts 1 (partial) and 2 through 5. (Doc. 132.) The Ninth Circuit affirmed this Court on all grounds raised. *Vantage Mobility Int'l LLC v. Kersey Mobility LLC*, 836 F. App'x 496 (9th Cir. 2020).

VMI now seeks leave to amend the FAC again to reintroduce claims and defendants the Court previously dismissed, and to add new claims.  Concomitant with leave to amend, VMI also seeks relief from the Court's Judgment dismissing BraunAbility for lack of personal jurisdiction, so that VMI might raise both reinstated and new claims against BraunAbility as contemplated in the Second Amended Complaint ("SAC"). (Doc. 264, "Motion for Relief.") Conversely, Kersey, the only remaining Defendant in the operative FAC, seeks summary judgment as against VMI's last remaining partial claim for breach of the Control Policy as regards the ADA. (Doc. 281, "MSJ.")

## II.    THE MOTION TO AMEND

The proposed SAC (Doc. 226 Ex. 1) would do several things. First, it would reintroduce VMI's claim against Kersey for breach of the Location Policy, and for breach of the Control Policy as regards the SDA, as well as claims for tortious interference with contractual relations[2] and civil conspiracy, all of which the Court previously dismissed with prejudice. (Motion to Amend at 7-11; SAC ¶¶ 172, 178.) Second, the SAC would reinstate as defendants BraunAbility, whom the Court dismissed for lack of personal jurisdiction, as well as Kersey Inc, Michael Kersey, Jensen8 and Michael Jensen (the "Seller Defendants"), all four of whom VMI named in the FAC but never served, and the counts against whom the Court dismissed. (Motion to Amend at 14–17.) Third, the SAC would add new defendant Arch. (Motion to Amend at 14–17.) And fourth, the SAC would add new claims,

---

[2] In the FAC, VMI pleaded only one count of tortious interference against the Seller Defendants; in the proposed SAC, VMI would allege two such claims, one against the Seller Defendants and one against BraunAbility and Arch.

including breach of the covenant of good faith and fair dealing (Count 2), and breach of the duty of confidentiality (Count 1), against Kersey. (Motion to Amend at 5, 10–12.)

### A. Legal Standard

Rule 15 provides that "leave to amend shall be freely given when justice so requires." *Foman v. Davis,* 371 U.S. 178, 182 (1962). The policy in favor of allowing amendments is subject to limitations. After a defendant files a responsive pleading, leave to amend is not appropriate if the "amendment would cause prejudice to the opposing party, is sought in bad faith, is futile, or creates undue delay." *Madeja v. Olympic Packers,* 310 F.3d 628, 636 (9th Cir. 2002) (internal quotations omitted). Whether a plaintiff has previously amended its pleadings also is a factor. *Manzarek v St. Paul Fire & Ins. Co.*, 519 F.3d 1025, 1034 (9th Cir. 2008.) "Futility alone can justify the denial of a motion for leave to amend." *Nunes v. Ashcroft*, 375 F.3d 805, 808 (9th Cir. 2003). Additionally, of all the factors, consideration of prejudice to the opposing party carries the greatest weight. *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). Finally, courts have observed that while Rule 15 "favors amendments when required by justice, it is not a license for…gamesmanship." *Feldman v. Allegheny Int'l, Inc.*, 850 F.2d 1217, 1225 (7th Cir. 1988).

### B. Analysis

#### 1. Revival of Contract Claims Against Kersey Previously Dismissed

The Court must evaluate each aspect of VMI's proposed amendments separately, as the factors may weigh differently depending on the facts surrounding each proposed amendment. The Court first reviews VMI's proposed amendment to revive those aspects of its contract claim based on breach of the Location Policy and the Control Policy as it pertains to the SDA.

Amendment to revive the claim for breach of the Location Policy is futile. As the Court found in its prior order dismissing this aspect of the contract claim,

> [t]he Location Policy obligates Kersey to take certain actions
> only if it "wishes to sell or cease operating one more of [its]

locations at or from which any or all of the Authorized Products are sold." [] The Location Policy "is only triggered when Kersey wishes to sell one or more of its 'locations,'" not upon a sale of its membership interest.

(Doc. 103 at 5 (internal citations omitted).) Kersey did not sell or cease to operate any of its locations. Rather, the owners of Kersey sold their interests in Kersey. Put another way, Kersey did not sell or close anything—Kersey itself was sold. Kersey retained and continued to operate its locations after the transaction. This is a fundamental difference that VMI—despite its arguments to the contrary at the motion to dismiss stage, during its motion for reconsideration, before the Ninth Circuit on appeal, and here in its Motion to Amend—understood, lest it would have no need to propose a separate Control Policy that explicitly addressed sale of the business itself, rather than sale of a location.[3]

VMI argues in its Motion to Amend that because the Location Policy can be triggered by a dealer's wish to sell **or to cease operating** a business location, Kersey had an obligation to provide it notice and the right of first refusal. (Motion to Amend at 9–10.) Put more directly, VMI argues the intent of the Location Policy was to protect VMI's expectation to protect its competitive territories. Whatever intent VMI subjectively had, the language of the Location Policy does not support its position. As the Court pointed out above, VMI demonstrated it knew how to craft a provision reserving a right of first refusal when a dealer's owner wished to sell control. It did so in the Control Policy and in the Term Sheet for the contemplated Exclusive Agreement. It did not do so in drafting the Location Policy, and as the Ninth Circuit held in affirming this Court, "[t]he Location Policy was not implicated by the [sale of Kersey to Arch] because [the sale] only involved the purchase of membership interests and not assets." *Vantage*, 836 F. App'x at 498.

VMI's proposed amendment to resurrect its Location Policy claim is in effect another motion for reconsideration of an issue it has lost twice in this Court and once at the

---

[3] Kersey also maintained all of its obligations to VMI under the Agreements between them. This fact addresses definitively VMI's claim that there was a breach of said contractual obligations upon the sale. Kersey did not assign its obligations to another. Kersey itself was sold. And it still had those obligations. Observation of corporate entities is not some trivial matter to be ignored. This portion of Claim 1 as amended would be futile as well.

Ninth Circuit, and it is therefore futile. It also is exemplary of VMI's counsel's consistent practice throughout litigation of this matter of recharacterizing or outright disregarding the Court's prior rulings.

The Court made clear, in its denial of VMI's motion to reconsider dismissal of partial Claim One and Claims Two through Five in the FAC, that those claims were dismissed with prejudice, and could not be cured through amendment; the only dismissal without prejudice was dismissal of BraunAbility as a defendant, because that might have been curable. (Doc. 113.) Nonetheless, VMI later argued to Magistrate Judge Willett in its discovery dispute briefing, and again to this Court in its appeal of Judge Willett's adverse ruling on that dispute, that VMI was entitled to conduct discovery on claims the Court had dismissed with prejudice. Judge Willett ruled—correctly—that VMI could not conduct discovery on claims this Court had dismissed. (Doc. 168 at 6.) In overruling VMI's objections to Judge Willett's ruling, this Court explicitly stated:

> Plaintiff argued to Judge Willett, and argues to this Court, that by extending time to amend its Complaint, this Court intended to allow Plaintiff to take discovery as to already dismissed claims. Therefore, Plaintiff reasons, Judge Willett clearly erred in not allowing such third-party discovery. That is simply wrong. As Judge Willett observed, "the Court's Order (Doc. 135) does not permit Plaintiff to conduct discovery that is outside the scope permitted by Rule 26(b)(1)." (Doc. 168 at 6.) Put another way, the Court extended the deadline for amending the Complaint to allow Plaintiff to engage in some discovery, but not unlawful discovery. If Plaintiff concluded otherwise, it is mistaken.

(Doc. 208 at 4–5.) The Court was clear in its Order denying reconsideration of its dismissal of claims, and again in affirming Judge Willett's discovery ruling, that discovery and amendment might be had on claims dismissed without prejudice, but could not be had on claims dismissed with prejudice.

VMI again ignored this ruling when it filed the instant Motion to Amend, more than a month later. In its Reply in support of the Motion, VMI asserted that the Court, in

reversing its prior ruling and allowing some discovery before sunsetting the amendment deadline, "held that dismissal of VMI's claims against Kersey was without prejudice, granting VMI the opportunity to move to amend the FAC and reassert those claims by August 1, 2020." (Doc. 253 at 2 (emphasis in original).) The Court held no such thing. Nor could it: the Court already had concluded amendment of the dismissed claims against Kersey and the Seller Defendants could not be cured by amendment. That is to say, the Court had determined as to those claims that VMI could state no set of facts that could cure the deficiencies in the claims as a matter of law. It would make no sense to allow discovery on claims for which no facts would provide a curative amendment.

In arguing that the Court's provision of additional discovery and amendment time was for any purpose other than to potentially cure the infirmities of the claims against BraunAbility dismissed without prejudice for lack of jurisdiction, VMI is—in the most charitable interpretation of what happened here—ignoring all context and adding words to the Court's ruling to arrive at the most self-serving and implausible result. That cognitive dissonance will now cease. The Court did not allow universal discovery for whatever purpose or claim VMI seeks to advance. It allowed discovery to give VMI the opportunity to cure defective claims the Court had dismissed without prejudice—namely the claims against BraunAbility—and said nothing to authorize revival of claims dismissed with prejudice.

VMI's conduct has created unnecessary, costly work for Defendants' counsel, and required the Court to spend copious amounts of time policing those many prior rulings— as it is doing here—to ensure compliance with them. The law of the case precludes amendment to reinstate the contract claim based on the Location Policy.

Similarly, VMI's attempt to revive its Control Policy breach claim as regards the SDA is futile. The Court ruled that the SDA, which governed Kersey's sale of VMI's automated product lines, provides that "[n]o modification or waiver of any provision(s) of the DRD will be deemed effective unless in writing and signed by each party." (Doc. 103 at 7.) The parties do not dispute that Kersey never signed the Control Policy. Thus, the

Court ruled that while VMI could state a claim for breach of the Control Policy under the ADA, it could not do so under the SDA. (Doc. 103 at 7.) The Court denied VMI's Motion for reconsideration on this ruling (Doc. 113 at 7) and the Ninth Circuit affirmed that denial on appeal. *Vantage*, 836 F. App'x at 499.

Although VMI expressly reasserts in the proposed SAC allegations that Kersey breached the Control Policy regarding the SDA (SAC ¶¶ 172, 178(h)), it makes no argument in its Motion to Amend why the Court should revisit this issue, and the Court sees none. Amendment to allege breach of the Control Policy regarding the SDA is futile. The Court will not permit it.

### 2. Reinstatement of BraunAbility, Michael Kersey, Michael Jensen, Kersey Inc. and Jensen8 as Defendants and Adding Arch as a Defendant

As noted above, the Court dismissed VMI's claim against BraunAbility in the FAC after finding it lacked personal jurisdiction over BraunAbility. (Doc. 103.) The Ninth Circuit affirmed that dismissal on interlocutory appeal. *Vantage*, 836 F. App'x at 498. This Court, however, allowed VMI some discovery and an opportunity to amend its FAC to cure deficiencies in personal jurisdiction. (Doc. 133; Tr. 4/23/20 at 2:24–5:7.) In its Motion to Amend, VMI asserts it has uncovered additional evidence that supports the Court's personal jurisdiction over BraunAbility under either the general or specific jurisdiction analysis.[4]

### a. There is no General Jurisdiction as to BraunAbility

VMI claims in discovery it uncovered "numerous new facts" pertaining to both

---

[4] VMI also filed a Motion for Relief from Judgment Based on Newly Discovered Evidence (Doc. 264), seeking to have the Court reverse its prior dismissal of BraunAbility based on lack of personal jurisdiction. Although the Court's determination of the Motion for Relief rests on Rule 60(b)(2)'s own test—the Court may relieve a party from a final judgment where "newly discovered evidence that with reasonable diligence could not have been discovered in time to move for a new trial"—that evidence must be of such magnitude that production of it earlier would have been likely to change the disposition of the case." *Jones v. Aero/Chem. Corp.*, 921 F.2d 875, 878 (9th Cir. 1990). Thus, the Court's determination of the Rule 60(b)(2) motion necessarily depends on its determination of the instant Motion to Amend, in that the Court must conclude, among other factors, that newly discovered facts, if any, are sufficient to avoid a finding of futility.

general and specific jurisdiction over BraunAbility. (Motion to Amend at 4.) It cites BraunAbility's "longevity, continuity, volume of economic impact, physical presence, and integration into Arizona's regulatory and economic markets," as well as BraunAbility's operation of  a 20,000-square-foot service center in Arizona and its ownership of a subsidiary—Arch—which owns five dealerships in Arizona. (Motion to Amend at 4; Proposed SAC ¶ 28.) Setting aside that VMI knew these "new" facts at the time it filed the FAC and raised them all to the Court's attention in resisting BraunAbility's Motion to dismiss,[5] they still do not suffice to give this Court general jurisdiction over BraunAbility.

The Court already has dedicated much ink to discussing the relevant law of general jurisdiction in this matter. (Doc. 102 at 4–5; Doc. 113 at 1–4.) It thus repeats only the dispositive. The "paradigm" for the exercise of general jurisdiction over a corporate defendant "is one in which the corporation is fairly regarded as at home." *Bristol-Myers Squibb Co. v. Sup. Ct. of Cal., San Francisco Cnty.*, 582 U.S. ___, 137 S.Ct. 1773, 1780 (2017) (internal citations omitted). And a corporation is fairly regarded as at home in "its place of incorporation and its principal place of business." *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. ___, 141 S. Ct. 1017, 1024 (2021).[6] Arizona is neither BraunAbility's place of incorporation nor its principal place of business, despite its operations here. As this Court found—twice—and the Ninth Circuit also held, general jurisdiction over BraunAbility does not lie in this District.

### b.  There is no Specific Jurisdiction as to BraunAbility

Although the Court discussed the law of specific jurisdiction in detail in its previous Orders dismissing BraunAbility (Doc. 102) and denying VMI's Motion to Reconsider that

---

[5]  Doc. 102 at 5 (noting, in evaluating general jurisdiction, VMI's allegation in the FAC that BraunAbility "operates five dealerships in Arizona," as well as VMI's reference to BraunAbility employing nearly 1 percent of its workforce and deriving just under 1.5 percent of its revenues in Arizona, and its allegation that BraunAbility "has conducted training, participated in disability conventions, and located a service facility in Arizona").

[6]  The Supreme Court in *Daimler AG v. Bauman*, 571 U.S. 117, 139 n.19 (2014), left open "the possibility that in an exceptional case" a corporation might be "at home" elsewhere, but the Ninth Circuit held in resolving VMI's interlocutory appeal in this matter that "[t]his is not an exceptional case" within the meaning of *Daimler. Vantage*, 836 F. App'x at 498.

decision (Doc. 113), it revisits that law here as applied to the additional facts VMI now alleges after the Court permitted discovery. The Ninth Circuit requires three elements to be met before specific jurisdiction will lie:  1) the non-resident defendant must do some act in or consummate some transaction within the forum, or perform some act by which it purposefully avails itself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; 2) the claim must be one which arises out of or results from the defendant's forum-related activities; and 3) the exercise of jurisdiction must be reasonable. *Data Disc, Inc. v. Sys. Tech. Assoc's., Inc.*, 557 F.2d 1280, 1287 (9th Cir. 1977). All three requirements must be met for jurisdiction to exist, and it is VMI's burden to establish the first two elements. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004).

The Court's analysis begins with element one—purposeful availment—and, upon conclusion that Plaintiff fails to meet that element, ends there as well. The Supreme Court recently discussed purposeful availment for purposes of determining specific jurisdiction in *Ford Motor Co.*:

> The defendant, we have said, must take some act by which [it] purposely avails itself of the privilege of conducting activities within the forum state. The contacts must be the defendant's own choice and not random, isolated, or fortuitous. They must show that the defendant deliberately reached out beyond its home—by, for example, exploit[ing] a market in the forum state or entering a contractual relationship centered there.

141 S.Ct. at 1024–25 (internal quotations and citations omitted).

In the context of intentional tort claims, which comprise all claims VMI would assert against BraunAbility, a plaintiff must show that defendant "purposefully directed his activities towards the forum." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1155 (9th Cir, 2006 (internal citation and quotation omitted). Purposeful direction, in turn, is determined by the "effects" test announced by the Supreme Court in *Calder v. Jones*, 465 U.S. 783, 789–90 (1984). The effects test requires that "the defendant allegedly must have 1) committed an intentional act, 2) expressly aimed at the forum state, 3) causing harm that

the defendant knows is likely to be suffered in the forum state. *Yahoo! Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme*, 433 F.3d 1199, 1210 (9th Cir. 2006).

The operative question, as the Supreme Court instructs, "is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects [it] to the forum in a meaningful way. *Walden v. Fiore*, 571 U.S. 277, 290 (2014). In other words, as this Court observed in its previous Order, "the relationship between the defendant, the forum state, and the litigation 'must arise out of contacts that the defendant himself creates with the forum state[.]'" (Doc. 102 at 6–7 (quoting *Walden*, 571 U.S. at 284).)

In dismissing BraunAbility from this action, the Court found that VMI's allegations in the FAC were inadequate as to the second "effects" test factor—whether BraunAbility's acts were expressly aimed at Arizona. (Doc. 102 at 7.) The Court thus concluded VMI had failed to show purposeful direction toward Arizona on BraunAbility's part, leaving the Court without specific personal jurisdiction over BraunAbility.

In its Motion to Amend and Motion for Relief from Judgment, VMI points to facts it developed in discovery the Court allowed after dismissing BraunAbility, which it urges constitute acts expressly aimed at Arizona within the meaning of the law, demonstrating purposeful direction by BraunAbility of activities toward Arizona, and thus purposeful availment of the privilege of conducting activities in Arizona. Michael Kersey testified in his deposition that in January 2019, he traveled to Tucson, Arizona ahead of dealer meetings with VMI, and contacted Greg Kiser, an officer of BraunAbility, and asked him to get together. (Doc. 264 Ex. 1, "Kersey Depo," Tr. 116:6–118:1.) Mr. Kiser and unspecified others, also presumably from BraunAbility, met Mr. Kersey in the restaurant of a Bass Pro Shops outlet in Tucson. (Kersey Depo, Tr. 118:2–5.) While the conversation over beers in the restaurant was "mostly talk[ing] fishing," on the walk after leaving the restaurant, Mr. Kersey told Mr. Kiser he "would consider selling" Kersey. (Kersey Depo., Tr. 118:6–18.) Kiser responded he was surprised, "and there was no more discussion." (Kersey Depo, Tr. 118:12–22.)

Shortly thereafter, Mr. Kiser and another BraunAbility official, J. R. Sauder, called Mr. Kersey and indicated that if he was serious about selling Kersey, Mr. Sauder would like to discuss it. (Kersey Depo, Tr. 118:23–119:14.)[7] Mr. Kiser excused himself and Messrs. Sauder and Kersey had a "pretty short" discussion, wherein Mr. Sauder asked if Mr. Kersey knew how much he wanted for the business and if he would be comfortable sharing tax returns. (Kersey Depo, Tr. 119:16–120:1.)

VMI argues that this newly discovered evidence—that a BraunAbility official accepted Mr. Kersey's invitation to meet in Arizona, received unsolicited word that Mr. Kersey would consider selling his business, and then followed up with a phone call to Mr. Kersey while he was still in Arizona to ask preliminary questions—demonstrates BraunAbility's purposeful direction of activities toward Arizona. The Court does not agree.

First, any action taken by Mr. Kersey cannot constitute contacts on behalf of BraunAbility. Unilateral activity by a plaintiff or other persons over whom the nonresident defendant has no control does not satisfy the purposeful availment requirement. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 US 408, 416–417 (1984); *Roth v. Garcia Marquez*, 942 F.2d 617, 621–22 (9th Cir. 1991). This is because the purposeful availment requirement exists to "ensure[] that a defendant will not be hailed into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or third person." *Burger King v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985) (citations and internal quotations omitted). Mr. Kersey's invitation to Mr. Kiser to meet, and his "surprise" communication of a willingness to sell Kersey were unilateral acts, and the fact that they occurred in Arizona, where neither Mr. Kersey nor Mr. Kiser lived or officed, are the definition of fortuitous.

And while Mr. Sauder's follow-up call to Mr. Kersey was of BraunAbility's own volition, such a solitary act with limited scope is the "attenuated contact" the Supreme

---

[7] While it is unclear if Messrs. Kiser, Sauder and/or Kersey were in Arizona at the time of the call, the Court must construe allegations in the light most favorable to VMI in the context of evaluating the pending motions, and thus will treat the allegation as so stating.

- 14 -

Court contemplated in *Burger King*. The sum of the call was an expression of interest in potentially buying Mr. Kersey's business, and a request for information. It was preliminary. The parties do not dispute that BraunAbility and Kersey did not sign a term sheet until March 2019, and did not finalize their agreement until June of that year. None of those activities took place in Arizona. And the object of all the activities was to purchase a Washington LLC that did business only in Washington and not in Arizona.

"The smaller the element of purposeful interjection, the less is jurisdiction to be anticipated and the less reasonable is its exercise." *Insurance Co. of N. Am. v. Cruz,* 649 F.2d 1266, 1271 (9th Cir. 1981). This single act is one that creates only an 'attenuated' affiliation between BraunAbility and Arizona. It will not support exercise of personal jurisdiction. *See Federal Deposit Ins. Corp. v. British American Ins. Co., Ltd*., 828 F.2d 1439, 1444 (9th Cir. 1987) (concluding that where all other relevant contacts occurred outside forum state, a foreign corporation was not subject to the forum state's jurisdiction solely because its employee was present in forum state briefly to close a deal at issue in the action); *Picot v Westin*, 780 F.3d 1206, 1213 (2015) (holding specific jurisdiction lacking in California despite defendant's two short trips to the state to further enterprise with plaintiff, because the majority of defendant's acts in developing and marketing the enterprise occurred in Michigan); *Douglas Furniture Co. of Cal., Inc. v. Wood Dimensions, Inc.*, 963 F. Supp. 899, 902 (C.D. Cal. 1997) (Arizona furniture manufacturer's act in sending cease-and-desist letters to a California manufacturer held not sufficient for finding of purposeful availment conferring specific jurisdiction).

Had BraunAbility actually negotiated the contract to purchase Kersey in Arizona, in whole or in substantial part, the result might be different. But that did not happen. All that occurred was a fortuitous contact and solicitation of interest by Michael Kersey, and a response by BraunAbility that it would like to further explore the possibility. That is simply not enough. By accepting the meeting, responding to Mr. Kersey's expression of willingness to sell with a request for more information, BraunAbility cannot be said to have purposefully availed itself of any Arizona market or the privilege of otherwise conducting

- 15 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

activities within Arizona. BraunAbility thus, by its limited reaction, did not have clear notice of its exposure in Arizona to suits arising from that act. *See Ford Motor Co.*, 141 S.Ct. at 1027. The Court finds VMI's proposed amendment to revive dismissed claims and add new ones against BraunAbility is futile, as personal jurisdiction still would be lacking. For the same reasons, it will deny VMI's Motion for Relief from Judgment seeking to reinstate BraunAbility as a defendant.

### c.  Claims Against Arch

In its Motion to Amend, VMI also seeks to amend to add Arch as a defendant in this matter for the first time, naming Arch in the tortious interference (Claim 5) and civil conspiracy (Claim 6) claims it would maintain against BraunAbility. As Arch has not yet been named in an operative complaint, it has not appeared to defend claims or otherwise. The Court's analysis with regard to Arch's minimum contacts with Arizona would be identical to those of BraunAbility. *See Silverton v. Dep't of Treasury*, 644 F.2d 1341, 1345 (9th Cir. 1981) ("A district court may properly dismiss on its own motion an action as to defendants who have not moved to dismiss where such defendants are in a position similar to that of moving defendants or where such claims are integrally related.")

Arch's place of incorporation, or organization, is Delaware. (Proposed SAC ¶ 17.) As for principal place of business, VMI simply alleges Arch is "operationally indistinguishable" from BraunAbility, who is its sole member and domiciled in Indiana. And VMI alleges no additional contacts or acts by Arch beyond those alleged as against BraunAbility and considered above in the Court's specific jurisdiction analysis. Thus the SAC does not allege facts from which the Court could conclude personal jurisdiction exists over Arch, and amendment to allow claims against it would be futile. Were the Court to look beyond the futility factor, it still would deny amendment to add Arch based on undue delay by VMI, prejudice to all Defendants, and previous amendment.

The Court concludes that the delay in adding Arch as a defendant was undue. VMI knew by June 2019—nearly a month before filing this matter—of Arch's role as purchaser of Kersey, its role in negotiating the purchase with Jensen8 and Kersey Inc., its role in

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

filing the action against VMI in Washington State court seeking a declaration that VMI's rights of first refusal and consent in the Agreements were unenforceable, and that it had access to the Agreements. VMI still knew all of this information in September 2019, when it filed its FAC. Yet it omitted Arch as a defendant in both complaints, even as it included Arch's parent, BraunAbility. Only much later—15 months after learning this information (proposed SAC ¶ 148), 14 months after instituting the action (Doc. 1), 12 months after amending its complaint for the first time (Doc. 37), and nine months after Arch dismissed its Washington action against VMI (Doc. 98)—did VMI seek to add Arch to this action. And by then the parties were within weeks of the close of discovery in this matter.

VMI has offered no justification for a delay that the Court finds would prejudice all Defendants, as it would require re-engagement in discovery after the extant parties have completed that cycle already. And in light of the conduct of discovery and motion practice in this matter to date, the Court has no confidence that such a revisitation would be any less extraordinarily contentious, inefficient and wasteful of Court and party resources than that already conducted in this case.[8] Such conduct utterly defeats the purpose of the Federal

---

[8]      In this matter, the parties have filed 16 separate notices of discovery dispute or equivalent, requiring the Court to resolve 23 disputed discovery issues. (Docs. 18, 39, 68, 127, 153, 159, 172, 179, 181, 197, 201, 215, 233, 260, 284, 288.) This includes five discovery disputes filed after the Court admonished the parties, *see* Doc. 204, that it believed they were not taking their duties to communicate and make good faith efforts to resolve disputes before bringing them to the Court. On a handful of occasions when the Court was urgently engaged in other matters, and to avoid unnecessary delay to the parties, the Court referred discovery disputes in this matter to Magistrate Judge Willett for more timely resolution. The parties appealed every decision Judge Willett rendered on the discovery disputes referred to her (Docs. 229, 177), thus utterly defeating the judicial economy measures the Court sought to employ in making the referrals, as on review, the Court found each of those appeals or objections without merit. (*E.g.*, Doc. 208.)

      Moreover, the parties could not agree to even the most basic administrative issues in this matter. As an example, VMI opposed Kersey's motion to stay the matter, at the same time it was seeking its own stay of the matter, which would have covered the equivalent time period. (Doc. 294.) Every, or nearly every, motion any party filed to modify the Scheduling Order in this matter was opposed. (*See, e.g.*, Docs. 211 & 213; 252 & 263; 259 & 271.) These sets of filings illustrate that, even as the parties sought extensions at the same time, each opposed the other's extensions for roughly equivalent time periods. The parties could not even agree on motions to seal, each seeking to seal materials whose disclosure would be detrimental to its own interests while opposing the sealing of roughly equivalent matters that the other party viewed as confidential for similar reasons. The Court has spent more time refereeing skirmishes between the parties in this matter than in any other it has encountered in nearly 7 years on the bench.

Rules of Civil Procedure, which is "to secure the just, speedy and inexpensive determination of every action and proceeding." Rule 1, Fed. R. Civ. P.

### d. Tortious Interference and Civil Conspiracy Claims Against Michael Kersey, Kersey Inc., Michael Jensen and Jensen8, Inc.

VMI's proposed revival of claims against Messrs. Jensen and Kersey, Jensen8 and Kersey Inc. (the "seller Defendants") are barred as both futile and the product of unreasonable delay, which also would cause unfair prejudice to the Seller Defendants as new parties and to Kersey. First, the Court previously "concluded that VMI failed to state claims" for tortious interference with contractual relations against the Seller Defendants in Count 2 of the FAC or civil conspiracy against those same defendants as alleged in Count 4 of the FAC. (Doc. 113 at 7; Doc. 103 at 12–14.) In denying VMI's Motion for Reconsideration of those rulings, the Court expressly ruled that "VMI would not be able to cure the defects in those claims by amendment," and thus they were dismissed without leave to amend. (Doc. 113 at 7.) VMI appealed this Order and the Ninth Circuit affirmed it in its entirety. *Vantage*, 836 F. App'x at 498 ("[VMI] appeals the district court's [] denial of motions for reconsideration[.] We affirm."). VMI wishes to once again argue the inapplicability of *Payne v. Pennzoil Corp.*, 672 P.2d 1322, 1327 (Ariz. Ct. App. 1983) (holding that where defendants "were acting for the company, they cannot be interfering with a contract of the company") to the facts of this case, but the Court will not do so.

Second, even if the Court revisited this thrice-determined issue, it finds in Section III *infra* that Kersey as a matter of law did not breach the Control Policy—VMI's last remaining claim. Without a breach of any Agreement, the third element of the test for Claim 3—intentional interference *causing a breach*—cannot be met. *ABCDW LLV v. Banning*, 388 P.3d 821, 831 (Ariz. Ct. App. 2016). And without any underlying tort, VMI cannot sustain its claim for civil conspiracy. *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Tr. Fund*, 38 P.3d 12, 37 (Ariz. 2002). VMI's tortious interference and civil conspiracy claim amendments are thus futile.

Finally, for the reasons set forth *supra* in Section II.B.2.c, the proposed amendments

to state claims against the Seller Defendants are unreasonably delayed. This is all the more so where VMI originally named the Seller Defendant in the original Complaint and, for strategic reasons, never served those Defendants. VMI's course of conduct makes clear that it could have raised these claims against the Seller Defendants at the outset of the case, but deliberately chose not to, until 14 months into the matter, when, again, discovery was all but closed.

### 3.  Addition of New Claims

In the SAC, VMI proposes new claims against Kersey, alleging a violation of its confidentiality obligations to VMI by disclosing "proprietary information" to BraunAbility and Arch. VMI also seeks to add an explicit claim for breach of the duty of good faith and fair dealing, which VMI argues was already implicit in the FAC's contract claim.[9] VMI bases its breach of duty of good faith and fair dealing claim on an Arizona Court of Appeals pronouncement that "a party can breach the implied covenant of good faith and fair dealing both by exercising express discretion in a way inconsistent with a party's reasonable expectations and by acting in ways not expressly excluded by the contract's terms but which nevertheless bear adversely on the party's reasonably expected benefits of the bargain." *Bike Fashion Corp. v. Kramer*, 46 P.3d 431, 435 (Ariz. Ct. App. 2002). (Motion to Amend at 11.)

As previously addressed in Section II.B.1 *supra*, the Court allowed VMI the opportunity to amend the FAC after several months of discovery to attempt to cure deficiencies in it, where amendment was not futile. The Court's Order thus prohibited resurrecting claims the Court had dismissed with prejudice, but it did not preclude raising new claims where the other factors for amendment were met. VMI's proposed new claims nonetheless fail upon review of those factors.

---

[9] VMI also seeks to add a new and separate claim for tortious interference against BraunAbility and Arch, and adds them to the civil conspiracy claim. Because the Court has already found that it lacks personal jurisdiction over BraunAbility and Arch, *see* Section II.B.2, *supra*, and because absence of any breach vitiates the tortious interference claim, and thus the civil conspiracy claim, as set forth immediately above in Section II.B.2.d, the Court need not further address these proposed additional claims.

1
2
3
4
5
6
7
8

VMI had all the information it needed to allege these proposed new claims at the outset of the case and still had it at the time it filed the FAC, as discussed throughout this Order. VMI was aware in June 2019, when Arch filed its declaratory judgment action in Washington State, which made clear that Arch had the ADA and SDA. VMI's Motion for Preliminary Injunction, filed July 11, 2019, months before it filed the FAC, showed VMI possessed the knowledge necessary to support the new claims. (Doc. 5 at 4.) It did not do so until 14 months into this litigation, and at the close of discovery.[10] VMI thus engaged in unreasonable delay in amending to add those claims, despite having previously amended.

9
10
11
12
13
14
15
16
17

Moreover, the Court finds that delay, and the timing of the ultimate offering of the claims, prejudiced Kersey unfairly and substantially as to those claims. The Court credits as highly plausible Kersey's assertion that it would have conducted discovery qualitatively differently were it aware of the fiduciary duty of confidentiality and good faith/fair dealing theories, which appeared nowhere in the original Complaint or the FAC.[11] To allow amendment now, after the lengthy time VMI had to raise the allegations and claims, and after Kersey has concluded its discovery, would result in substantial and unfair prejudice to Kersey, depriving Kersey of the notice it would need to conduct discovery to defend on

18
19
20
21
22
23
24
25

[10] In the Rule 26 Joint Case Management Report filed in this matter on March 31, 2020, VMI set forth elements for "breach of fiduciary duty." (Doc. 118 at 5–6.) But as Kersey pointed out on page 7 of that filing, VMI had pleaded no such claim in the FAC. In fact, Kersey put VMI on notice that a fiduciary duty claim was not part of the case at that point, including an "[o]bjection to VMI's inclusion of the breach of fiduciary duty elements in the Case Management report" precisely because "no such count was pled in the First Amended Complaint, and accordingly it is not properly included in this Plan." (Doc. 118 at 7.) Plaintiff did not thereafter move to amend to add such a claim until August 2020, after almost all fact discovery had elapsed, and during which period Kersey was not obligated to conduct discovery directed to that non-extant claim. That is not diligence. VMI demonstrated amply during the course of this litigation that it could file voluminous and lengthy motions quickly and frequently. There is no excuse for waiting five months after the case management report, and six months after the Court dismissed all the other claims, until a point where the time for Defendant to conduct discovery targeted to a new claim was exhausted or practically so, to move to amend and add such claim.

26
27
28

[11] VMI urges the Court to disregard Kersey's argument that the delay in amending prejudiced Kersey because adding new claims after discovery is nearly over gives Kersey no time to develop defenses thereto through discovery. (Reply at 5–7.) Yet VMI makes the same argument in opposing Kersey's motion to amend its answer to the FAC. (Doc. 270 at 2–3.) The Court scarcely could imagine a more effective acknowledgement by VMI of the merits of Kersey's position.

the additional theories. And as the Court previously stated, it will not reopen discovery in this matter after the scorched-earth shenanigans that already have taken place. Thus, upon a finding of unreasonable delay, unfair prejudice to non-amending parties, previous amendment by VMI and lack of good faith, the Court will not permit amendment to add the new good faith/fair dealing claim or breach of contract claim based on a theory of breach of fiduciary duty of confidentiality.

The Court thus will deny VMI's Amended Motion for Leave to Amend First Amended Complaint (Doc. 226) in whole. For the same reasons, it will deny VMI's Motion for Relief from Judgment Based on Newly Discovered Evidence. (Doc. 264.)

## III.   THE MOTION FOR SUMMARY JUDGMENT

### A. Legal Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when: (1) the movant shows that there is no genuine dispute as to any material fact; and (2) after viewing the evidence most favorably to the non-moving party, the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288–89 (9th Cir. 1987). Under this standard, "[o]nly disputes over facts that might affect the outcome of the suit under governing [substantive] law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" of material fact arises only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In considering a motion for summary judgment, the court must regard as true the non-moving party's evidence, if it is supported by affidavits or other evidentiary material. *Celotex*, 477 U.S. at 324; *Eisenberg*, 815 F.2d at 1289. However, the non-moving party may not merely rest on its pleadings; it must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a material question of fact. *Anderson*, 477 U.S. at 256–57 (holding that the plaintiff must present affirmative

evidence in order to defeat a properly supported motion for summary judgment); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968).

"A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "Summary judgment must be entered 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *United States v. Carter*, 906 F.2d 1375, 1376 (9th Cir. 1990) (quoting *Celotex*, 477 U.S. at 322).

### B. Analysis

Kersey moves for summary judgment on the final remaining claim in the matter—VMI's claim that Kersey breached the Authorized Dealer Agreement (ADA) between them by violating the Control Policy that VMI had sent via email to all of its dealers on November 21, 2018. Kersey argues that VMI's delivery of the Control Policy constituted a contract modification which Kersey never assented to, and therefore never took effect. VMI argues that 1) the Control Policy was simply a clarification of the agreement already in place, for which no assent is required (Doc. 296 at 8–10), and 2) if it was a modification for which assent is required, Kersey did assent by its behavior (Doc. 296 at 10–13).

### 1. The Control Policy is a Modification to the ADA, Requiring Assent

Kersey asserts that the Control Policy represents an attempt by VMI to modify the ADA, because it would impose a restriction on Kersey's ability to be sold, among other things, which restriction was not present in the ADA. VMI argues that the Control Policy was merely a clarification of existing policy. That is not the case. No provision of the ADA, prior to introduction of the Control Policy, so limited Kersey's sale by its owners.[12] The

---

[12] The Court previously ruled on this precise question:

> Although VMI refers to its addition of the Control Policy to the DRD as a "modification," it is actually a proposed new agreement on a term—the alienability of Kersey's membership interests—that no other part of the Agreement or Policies contemplated. It is a "modification" in the sense that it modifies the relationship between VMI and Kersey, but not in the sense that it modifies an existing contractual term.

Control Policy thus was, as the Court previously reasoned, a substantive modification of the ADA.

As this Court previously ruled,

> "A contract cannot be unilaterally modified nor can one party to a contract alter its terms without the assent of the other party." *Yeazell v. Copins*, 402 P.2d 541, 545 (Ariz. 1965). This is true even if the original contract purports to allow one party to modify the contract by methods other than issuing a new contract, such as publishing a supplemental policy; in that instance, the provision in the original contract allowing modification by supplement is "no more than an offer to modify the existing contract," for which there still must be assent and consideration to become enforceable. *Demasse v. ITT Corp.*, 984 P.2d 1138, 1141, 1144 (Ariz. 1999). And this is true even in the context of Article 2 of the Uniform Commercial Code (UCC), governing the sale of goods, which Arizona has adopted. Although UCC § 2-209, which Arizona codified at A.R.S. § 47-2209, allows modification of a contract for the sale of goods without consideration, "section 2-209 requires assent to proposed modifications." *Arizona Retail Sys., Inc. v. Software Link, Inc.*, 831 F. Supp. 759, 764 (D. Ariz. 1993).

(Doc. 103 at 8.) The Ninth Circuit has affirmed the above ruling. *Vantage*, 836 F. App'x at 499 (citing *DeMasse v. ITT Corp.*, 984 P.2d 1138, 1145 (Ariz. 1999) and stating that "an offeree 'does not manifest consent to an offer modifying an existing contract without taking affirmative steps, beyond continued performance, to accept'"). The Court therefore must determine whether a controverted issue of fact exists over whether Kersey "manifested consent"—or in other words, assented—to the modification in the Control Policy under the applicable law.[13]

---

(Doc. 103 at 8.) VMI's arguments to the contrary in its Response to the MSJ are without merit and in any event precluded by the law of the case. *Vantage*, 836 Fed. Appx at 499.

[13] Whether conduct constitutes assent is generally a question of fact. *Empire Mach. Co. v. Litton Bus. Tel. Sys.*, 566 P.2d 1044, 1049–50 (Ariz. Ct. App. 1977). But summary judgment is appropriate when "[a]ny reasonable view of the evidence inevitably leads to the conclusion that there was no meeting of the minds and no enforceable contract was ever formed." *Hill-Shafer*, 799 P.2d at 817.

## 2.  Kersey did not Assent to the Control Policy

As the "predominant aspect and purpose" of the ADA "is the sale of goods," it is subject to Article 2 of the Uniform Commercial Code (UCC). *Double AA Builders, Ltd. v. Grand State Constr. L.L.C.*, 114 P.2d 835, 841–42 (Ariz. Ct. App. 2005). But whether the Control Policy is evaluated under UCC or the general common law of contract, the analysis would be the same. A.R.S. § 47-1103(B)(2006) ("Unless displaced by the particular provisions of this title, the principles of law and equity, including the law merchant and the law relative to capacity to contract [] and other validating or invalidating cause supplement its provisions.") The Court thus will evaluate Kersey's assent, or lack thereof, to the Control Policy according to Arizona's common law of contract, except where displaced by A.R.S. Title 47, Arizona's enactment of the UCC.

Kersey asserts in its statement of facts that it never affirmatively accepted or acknowledged receipt of the Control Policy (DSOF at 27), and VMI has offered no controverting facts demonstrating otherwise. Rather, VMI argues that Kersey made a silent acceptance of the provision. Acceptance will only be effective where done in a way that is "reasonable under the circumstances." A.R.S. § 47-2206(a)(1). And "[a]cceptance by silence is exceptional." Restatement (Second) of Contracts § 69 cmt. a (1981) ("Restatement"). Indeed, the law recognizes only three such exceptions, wherein silence would constitute assent or acceptance:

> (a) Where an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation.

> (b) Where the offeror has stated or given the offeree reason to understand that assent may be manifested by silence or inaction, and the offeree in remaining silent and inactive intends to accept the offer.

> (c) Where because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not intend to accept.

Restatement § 69(1). The Court reviews the facts asserted to determine whether a controverted issue of fact exists as to any of these exceptions.

The first exception does not apply to the facts of this matter. The Control Policy VMI issued did not offer any services from VMI that Kersey could accept. Regarding the second exception, VMI has presented no facts that would show it gave Kersey reason to understand its silence or inaction would manifest assent. As a preliminary matter, VMI gets the test for this element backwards in its argument, putting itself in the shoes of the offeree and Kersey in the place of the offeror.[14] This juxtaposition of roles is fatal; it is VMI who must put Kersey on notice that exceptional means of acceptance by Kersey will bind Kersey, not the other way around.

In any event, VMI's argument still fails on the merits. VMI argues that the parties' entry into the ADA, which provided in part that "[a]t any time and without prior notice . . VMI may modify any or all of the Dealer Policies . . . with each such modification . . . becoming effective immediately, unless VMI notifies Dealer in writing of another effective date" (ADA ¶ 7), triggered the exception. But the Court has already ruled that the ADA could not be unilaterally modified, nor could one party alter its terms, without the other party's assent (Doc. 103 at 8), and in affirming this Court's ruling, the Ninth Circuit so held that "Arizona law has rejected [VMI's] argument." *Vantage*, 836 F. App'x at 499 (*citing Demasse*, 984 P.2d at 1146) ("[O]ne party to a contract cannot by its own acts release or alter its obligations. The intention must be mutual.").

The Court concludes VMI has produced no evidence that it stated or gave Kersey reason to understand that Kersey's assent could be manifested as silence or inaction, or that in remaining silent and inactive, Kersey would manifest an intent to accept. Indeed, VMI's conduct and communications with regard to the Control Policy demonstrate exactly the

---

[14] "Kersey 'stated or g[ave] the offeree [VMI] reason to understand that assent may be manifested by silence or inaction, and that the offeree in remaining silent and inactive intends to accept the offer' by agreeing VMI could unilaterally modify or amend the Dealer Policies in writing, with immediate effect, and by agreeing that neither party would need to sign the document." (Doc. 296 at 11–12 (modifications in original).)

opposite. Among other actions, the language VMI chose to use in conveying and characterizing the Control Policy as merely an "update" or "clarification" would suggest to any recipient that there was no new contractual term on the table at all. The second exception in Restatement § 69(1) does not apply.

As to the third exception, the Court agrees with Kersey that there has been no evidence produced pertaining to the parties' previous course of dealing that would suggest silence was a reasonable mode of acceptance here. In its Statement of Facts supporting the MSJ, Kersey asserts as follows:

> The Control Policy represented the first time VMI had attempted to unilaterally issue a generally-applicable policy under the ADA. To the extent VMI had ever made unilateral adjustments to its dealer relationships, those modifications dealt with dealer-specific issues like sale minimums and territories.

(Doc. 282, DSOF ¶ 10.) In its controverting Statements of Fact, VMI identified this statement as "undisputed." (Doc. 297, PSOF ¶ 10.) The Court has before it no other facts supporting a previous course of dealing making Kersey's silence a reasonable mode of acceptance in such circumstance. And the facts before the Court are to the contrary. Where, for example, the parties did discuss a provision restricting Kersey's alienation of its ownership interest, it was the subject of express discussion and negotiation in the potential ten-year Exclusive Agreement—an agreement the parties ultimately failed to reach. This is further persuasive evidence that the provisions of the Control Policy were not the kind of terms for which silence would be a reasonable mode of acceptance.

Where VMI understood that restrictions on Kersey's right of alienation would be the subject of active negotiation in any exclusive agreement, they would expect Kersey would similarly treat with the Control Policy. Moreover, as this Court already has recognized, "[t]he fact that Kersey may have continued to act as an authorized dealer of VMI products after VMI sent the Control Policy to Mr. Kersey is not convincing evidence of assent, because the daily business of sales did not implicate the terms of the Control

Policy." (Doc. 103 at 10.) *See also Expedition Leather LLC v. FC Organizational Prods. LLC*, 2013 WL 160373, at *4 (D.N.H. Jan. 15, 2013) (holding that, where defendant shipped goods to plaintiff after purported term was offered via email, defendant "was not performing any task indicated in the March 2008 email or the attached terms and conditions") Contrary to VMI's arguments, Kersey's conduct was merely a continuation of the parties' prior course of dealing under the extant ADA.[15]

The Court notes also that it denied in part Kersey's Motion to Dismiss after concluding that VMI's allegations in the FAC were sufficient, "if just barely," to support a claim of assent to the terms of the Control Policy. (Doc. 103 at 9.) The allegations on which the Court grounded its ruling in favor of VMI were

> that "members of VMI, including Jeff Weston, met with Mr. Kersey on November 14, 2018, at the Stuck Junction Saloon in Sumner, Washington to discuss, among other things, the Control Policy" and "[a]t no point during the meeting did Mr. Kersey object to the Control Policy." VMI also alleges that "[o]n November 21, 2018, VMI sent Mr. Kersey an email notifying him of the supplement and provided him with a copy of the Control Policy," and that "[u]pon information and belief, Mr. Kersey opened the email."

(Doc. 103 at 9 (quoting FAC ¶¶ 32, 33, 38).) Subsequent discovery has diminished these allegations that the Court previously found barely adequate to maintain a claim at the pleading stage. VMI's representative, Mr. Weston, has made clear through his deposition testimony that the only discussion of any change of control provision occurring at the Stuck

---

[15] Because the Court will dispose of VMI's remaining claim based on Kersey's lack of assent to the modification of the ADA to add the Control Policy, it need not reach the issue of damages. The Court would note that, had it reached the damages issue, its prior ruling abrogating and severing the Control' Policy's perpetuity clause (Doc. 103 at 10–11), which ruling has now been affirmed on appeal, would have precluded all or the vast majority of damages Plaintiff claims. The Court previously ruled "invalid the Control Policy term that it will survive the termination of the underlying Agreements," and severed it from the remainder of the Control Policy. (Doc. 103 at 10–11.) The ruling resulted in the preservation of Kersey's ability to terminate the ADA without cause, upon thirty days' notice to VMI, pursuant to Paragraph 5 of the ADA. (Doc. 21 Ex. 1 at 10.) Thus, had Kersey been obligated to offer VMI the right of first refusal and or the right of approval over sale, and breached that obligation, VMI's damages would have been limited to expectation of benefits under the ADA only, for the thirty days between breach and termination of the ADA pursuant to ADA Paragraph 5.

Junction Saloon meeting pertained to the proposed Exclusive Agreement—which the parties ultimately never entered—and not to the Control Policy. (Doc. 297, CSOF ¶ 49.)[16] Mr. Weston testified in his deposition that he did not discuss the Control Policy at the saloon meeting.[17] He repeatedly stated that there was some vague discussion of an element in the term sheet which was similar, or "relative," to the Control Policy.[18] But the term sheet pertained only to the Signature Agreement, which the parties never entered, and not to the Control Policy. According to Mr. Weston, the closest he got to discussing the Control Policy with Mr. Kersey at the meeting was a vague statement that "we" would need to clarify it.[19] And he acknowledged several times that neither Mr. Kersey nor Mr. Jensen ever agreed to or acknowledged the Control Policy.[20]

Accordingly, there is now before the Court no factual dispute but that the Stuck Junction Saloon conversation between Messrs. Weston and Kersey was about the proposed Exclusive Agreement only, and not about the Control Policy. As a result, there is no

---

[16] "Mr. Kersey, Mr. Jensen, Mr. Weston, and Mr. Shaughnessy discussed a term sheet for a new VMI "Signature Dealer Agreement" following a dinner at the Stuck Junction Saloon in Sumner, Washington on November 14, 2018, and specifically a term that provided VMI with a right of first refusal if the dealer 'wishes to sell its business at any time during the term of this agreement.'"

[17]     "Q: Are you now saying that you had a conversation with Mike Kersey and Mike Jensen [at the Stuck Junction] about the [] assignment and change of control policy that had not come out yet?
        A: No, we talked about the element in the term sheet [for the Exclusive Agreement] that was relative to this."
(Doc. 297 Ex. C, Weston Depo. at 120:10–17.)

[18]     "Q: Tell me your best memory of what you said to Mike Kersey and Mike Jensen about the assignment and control policy that issued on the 16th.
        A: So, again, we didn't discuss it, that assignment and change of control policy by name. We [] talked about how there was this element in the term sheet that talked about it."
(Weston Depo. at 121:19–25.)

[19]     "Q: When you were at the saloon with Mike Kersey and Mike Jensen, do you recall telling them that next week we're sending out an assignment and change of control policy?
        A: I don't think we were that specific. [] But I do recall saying something to the effect that we need to clarify and make sure everybody understands."
(Weston Depo. at 120:25 – 121:9.)

[20] (Weston Depo. at 119:8–17.)

supporting factual allegation, disputed or not, that there were ever discussions between Kersey and VMI about the Control Policy. All that remains is the allegation that VMI emailed the Control Policy and a notification thereof to Kersey and all of its other dealers, and Kersey did not acknowledge it. This is not enough for a finding of assent, as a matter of law.

Finally, in discovery, VMI learned that during discussions with BraunAbility in February 2019, Mr. Kersey sent BraunAbility Vice President J.D. Sauder an email conveying due diligence documents in which he stated, "VMI's agreement stipulates that VMI must approve change in ownership." (Proposed SAC ¶ 99; Doc. 226 Ex. 4 at 7.) VMI argues, irrespective of any Restatement § 69 analysis, that this statement to BraunAbility is evidence of Kersey's assent to the Control Policy.[21] The argument fails. The communication was not to VMI. Indeed, VMI did not even know of it until after bringing this action and commencing discovery. The communication thus created no meeting of the minds necessary to constitute assent. *See, e.g., Hill-Shafer*, 799 P.2d at 814–15 ("A contract has been formed if there is a manifestation of mutual assent to the exchange and a consideration.") (internal citations omitted). An offeree's communication to a third party, especially where there is no expectation or even foreseeability the offeror will learn of it, is not such a manifestation. Restatement § 19 cmt. c (1981)("[T]hough the intentional conduct of a party creates an appearance of assent on his part, he is not responsible for that appearance unless he knows or has reason to know that his conduct may cause the other party to understand that he assents.") Plaintiff provides, and the Court finds, no case law to the contrary.

## IV.    CONCLUSION

The Court finds there is no contested issue of fact over whether Kersey assented to modification of the ADA to include the Control Policy. It therefore will grant Kersey summary judgment on VMI's Control Policy claim. (Doc. 281.) Because no claims remain,

---

[21] To the extent VMI would argue Mr. Kersey's email statement would support a revival of its Location Policy breach of contract claim, the Court rejects the argument. VMI has urged it and lost three times, twice before this Court and once before the Ninth Circuit.

the Court will deny as moot Kersey's Motion to Amend Answer to the FAC (Doc. 258) and its Appeal of Magistrate Judge Decision to the District Court (Doc. 229). Additionally, because the primary focus of Kersey's Motion for Sanctions (Doc. 233) was the preclusion of evidence, the Court will deny as moot that motion as well. As set forth in Section II *supra*, the Court will deny VMI's Motion for Leave to Amend the FAC (Doc. 226) and its Motion for Relief from Judgment Based on Newly Discovered Evidence (Doc. 264).

**IT IS ORDERED** denying VMI's Motion for Leave to Amend the First Amended Complaint (Doc. 226);

**IT IS FURTHER ORDERED** denying VMI's Motion for Relief from Judgment Based on Newly Discovered Evidence (Doc. 264);

**IT IS FURTHER ORDERED** granting Kersey's Motion for Summary Judgment (Doc. 281);

**IT IS FURTHER ORDERED** denying as moot Kersey's Motion for Leave to Amend Its Answer to the First Amended Complaint (Doc. 258);

**IT IS FURTHER ORDERED** denying as moot Kersey's Appeal of Magistrate Judge Decision to the District Court (Doc. 229);

**IT IS FURTHER ORDERED** denying as moot Kersey's Motion for Sanctions (Doc. 233);

**IT IS FURTHER ORDERED** directing the Clerk of Court to enter judgment for Kersey on all claims against it and terminate this matter.

Dated this 26th day of April, 2021.

_____
Honorable John J. Tuchi
United States District Judge